UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CANON U.S.A., INC.                          CIVIL ACTION

VERSUS                                      NO:      07-01201

S.A.M., INC.                                SECTION: "S" (4)

## ORDER

Before the Court is **Canon U.S.A. Inc.'s Motion to Compel Production of Documents and for Sanctions (R. Doc. 74)**, filed by the Plaintiff, Canon U.S.A., Inc. ("Canon"), seeking a motion compelling the Defendant to supplement its discovery and sanctioning it for abusing the discovery process.[1]  In opposition, the Defendant, S.A.M., Inc. ("SAM"), filed a Memorandum in Opposition to Canon's Motion to Compel and for Sanctions (R. Doc. 89).  Thereafter, Canon filed Canon U.S.A., Inc.'s Reply Memorandum in Support of Its Motion to Compel and for Sanctions (R. Doc. 101).  The motion was heard on Wednesday, May 21, 2008 with oral argument.

I.     **Background**

Canon is the exclusive distributor of Canon products in the United States.  SAM is company owned by Haim Toorgeman ("Toorgeman"), previously located at 635 Canal Street, New Orleans,

---

[1] While Canon only files one motion pleading with the Court, the contents of the motion effectively contain the substance of two discrete motions: (1) a motion to compel discovery and (2) a motion for sanctions regarding previous discovery.

Louisiana.  On August 5, 1998, Canon and SAM entered into a Dealer Agreement whereby SAM became a dealer for Canon, selling Canon products.  The Dealer Agreement set forth the rights and responsibilities of the parties including the terms and conditions for payment.  The parties also entered into a Security Agreement covering Canon products.

On August 29, 2005, the building housing SAM sustained flooding and other damage from Hurricane Katrina.  As a result, SAM allegedly lost many business-related documents and items.  The property was also purportedly damaged by Hurricane Rita, and a subsequent electrical fire to the building.  (R. Doc. 74-6, Ex. A, p. 31; R. Doc. 74-20, Ex. O-1.)

On March 7, 2007, Canon filed this action contending that it had delivered cameras to SAM and SAM had failed to pay for them, therefore breaching the Dealer and Security Agreements.  SAM answered, denying liability and filing various counterclaims against Canon, contending that Canon breached its agreements and obligations to SAM by withholding shipments and unfairly allocating shipments in favor of other dealers.  (R. Doc. 6.)  Thereafter, Canon filed a motion to dismiss SAM's counterclaims, and the Court granted Canon's motion as to several of SAM's counterclaims.  (R. Doc. 36.)

SAM subsequently amended its pleadings and alleged that Canon violated the Dealer Agreement by removing SAM, without notice, from Canon's Midwest Regional group to the Channel Sales group and unilaterally terminating promotions, programs, discounts, and credits previously available to SAM.  (R. Doc. 52, p. 6.)  Accordingly, SAM alleges that Canon effectively deprived SAM of its profits and its financial ability to carry a representative inventory and purchase minimum period unit quantity inventory of Canon cameras.  (R. Doc. 52, p. 7.)  In defense, Canon contends that SAM transhipped Canon products to other dealers, in violation of the Dealer

Agreement.

On July 2, 2007, Canon propounded interrogatories and document production requests upon SAM.  (R. Doc. 74-6, Ex. A.) SAM responded, indicating that many of the requested documents were destroyed in the hurricanes or the fire, and that SAM would continue to search for responsive documents and supplement accordingly.

On December 12, 2007, the parties deposed Toorgeman.  During the deposition, the parties learned information about SAM, its relationship with other interrelated businesses, and Toorgeman's subsequent storage of documents regarding SAM's sale of Canon products.  Toorgeman also testified that he sold products received by Canon wholesale to Dbuys.com, and the Camera Center in Israel.  (R. Doc. 74-11, Ex. F.)

During Toorgeman's deposition, he testified about two sources of documentary information potentially responsive to Canon's earlier discovery requests: (1) SAM's server, which was used for internet sales, recording customer data, and emailing, and located in his Florida home, and (2) paper documents stored in boxes, also at his Florida home.  (R. Doc. 74-11, Ex. F.)  Toorgeman maintained that he looked "every day" for material relevant to the lawsuit and responsive to Canon's requests, but revealed that he "forgot about" the server because he had been occupied with salvaging his store merchandise after the hurricanes and fire.  (R. Doc. 74-11, Ex. F,  pp. 3-4.)  Additionally, he testified that he did not know how to access the server, and therefore, engaged his son, Edan Toorgeman, to assist him in reviewing the server's contents.  (R. Doc. 74-11, Ex. F, p. 6.)  He indicated that on one occasion, his son had discovered various emails, a customer record, a record of sales from 2004 and 2005. (R. Doc. 74-11, Ex. F.)  However, he maintained that he was uncertain whether his son had completed a thorough search of the server because his son was occupied with

3

simultaneously seeking employment.  (R. Doc. 74-11, Ex. F.)

Toorgeman also testified that there were boxes of records at his home which his son and wife, Miriam Toorgeman, looked through on occasion when looking for clothes.  (R. Doc. 74-11, Ex. F.)  He did not search the boxes himself.  Based on these facts, Canon brings the subject motion to compel and for sanctions.  SAM opposes the motion.

**II.**      **Standard of Review**

        **A.**      **Answering and Supplementing Discovery**

Federal Rule of Civil Procedure ("Rule") 26(b)(1) provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense."  The Rules specify that "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  The discovery rules are accorded a broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials.  *Hebert v. Lando,* 441 U.S. 153, 176 (1979).  Nevertheless, discovery does have "ultimate and necessary boundaries."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)).  Furthermore, "it is well established that the scope of discovery is within the sound discretion of the trial court."  *Coleman v. American Red Cross*, 23 F.3d 1091, 1096 (6th Cir.1994).

An evasive or incomplete response is equivalent to a party's complete failure to respond.  Fed. R. Civ. P. 37(a)(4).  Furthermore, a party is not excused from a failure to fully respond to a document production request merely because it does not possess the responsive requested materials.  *Somerset Marine, Inc. v. Briese Schiffahrts GMBH & Co*., No. 01-01881, 2002 WL 1933723, at *3 (E.D. La. Aug. 21, 2002).  Rather, a party's duty to fully answer implies a duty to make reasonable

efforts to obtain the information requested.  *Id*.

Furthermore, Rule 26(e)(1) provides that parties must supplement or correct their discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

Rule 26 also governs the production of electronically stored information.  Specifically, Rule 26(b)(2) provides that "[a] party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of the undue burden or cost." However, where electronic discovery is reasonably accessible, the responding party must foot the costs of searching for and producing electronic discovery. *Zubulake v. UBS Warburg, LLC*, 217 F.R.D. 309, 324 (S.D.N.Y. 2003).  Machine-readable data, such as active, online, near-line, or offline data in storage or archives are accessible, however, backup tapes and erased, fragmented, or damaged data is not accessible.  *Id*. at 319-20.  Furthermore, the producing party bears the burden to show that the information is not reasonably accessible. Fed. R. Civ. P. 26(b)(2).

### B.    Discovery Sanctions

Under Rule 37, a court may sanction a party on motion, if that party fails to timely supplement or correct a response to discovery that is incomplete or incorrect.  Fed. R. Civ. P. 37(c)(1); Fed. R. Civ. P. 26(e).  To that end, the court may award reasonable attorney's fees and costs, caused by the party's failure to respond or supplement. Fed. R. Civ. P. 37(c)(1)(A). Sanctions are inappropriate where the failure to supplement or correct a response was substantially justified or harmless.  Fed. R. Civ. P. 37(c)(1).  In determining whether a party's failure to sufficiently response is harmless or substantially justified, a court generally considers: "(1) the importance of

the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Texas A&M Research Foundation v. Magna Transp. Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

## III.   Analysis

### A.   Motion to Compel Responses to Requests for Production 4, 5, 7, 8, 9, 10, and 17

On July 2, 2007, Canon propounded interrogatories and document production requests upon SAM.  (R. Doc. 74-6, Ex. A.)  However, Canon asserts that SAM did not provide responsive documents to many of Canon's inquiries, but rather asserted that the documents were destroyed, or that SAM would continue to search for responsive documents and supplement accordingly.  Despite SAM's assertions, Canon alleges that SAM only produced a few subsequent documents, and SAM's owner admitted that he did not diligently search for responsive materials.

Canon therefore brings the subject motion, seeking paper and electronic documents from SAM's computer server, and for sanctions against SAM for withholding responsive documents and providing misleading and incomplete responses to Canon's requests.  Canon specifically argues that it did not receive sufficient responses to its Requests for Production 4, 5, 7, 8, 9, 10, and 17.

In Requests for Production 4, 5, 7, 8, 9, 10, and 17, Canon seeks documents from 1998 to 2006, including (1) records of product deliveries by Canon, (2) sales records for Canon products sold by SAM, (3) documents regarding the store destruction and inventory lost from the hurricanes and fire, (4) inventory tracking documents, (5) correspondence between Canon and SAM, and (6) documents listed in SAM's initial disclosures.  (R. Doc. 74-6, Ex. A, pp. 11-13.)  In response to the Requests, SAM indicated that either the documents did not exist because of the hurricanes and the

6

fire, or that it was searching for responsive information and would supplement its responses accordingly. (R. Doc. 74-6, Ex. A, pp. 26-30.) Nevertheless, SAM produced an article from The Times-Picayune as evidence of the fire, and indicated that it had provided the documents referred to in its initial disclosures.

However, Canon contends that Toorgeman later revealed that he had a server at his Florida home which contained electronic information about SAM's operations before Hurricane Katrina and SAM discovered five (5) to six (6) relevant emails off of the server. Canon further asserts that Toorgeman indicated that after Hurricane Katrina and the fire, SAM shipped Canon products to wholesale dealers, including Dbuys.com in Brooklyn, New York and Camera Center in Israel, in violation of the Dealer Agreement. Canon believes these documents may be stored in the boxes in SAM's home in Florida, and therefore seeks the Court to compel the production of the documents.

Canon contends that SAM should hire a computer forensics specialist to examine the server and extract responsive documents at SAM's expense, especially given that SAM has already engaged a forensic computer specialist to review Canon's production of electronically stored information ("ESI"). Canon contends that SAM cannot hide behind Toorgeman's professed inability to access the information to escape its duty to produce and diligently search for responsive documents. Furthermore, Canon asserts that any delay is not justified because Hurricane Katrina and the fire occurred over two (2) years ago, and Canon now seeks documents located in Florida.

In opposition, SAM indicates that it has complied with the duty to supplement set forth in the Rules, and that Canon assumes that there is more available evidence than is the case. SAM contends that Toorgeman continues to look for information and inspect the server, but Toorgeman has been unable to locate any other documents, despite his ongoing efforts. Furthermore, SAM

notes that dealers placed orders over the telephone and Canon's own supervisor, Richard S. Antaya, testified that he learned of transshipping by Toorgeman via the telephone, and not written correspondence.   SAM notes that Canon, not SAM, would be in possession of relevant documentation. Further, SAM contends that evidence regarding the breach of the Dealer Agreement because of transshipping is irrelevant because Canon's supervisors testified that SAM was not in breach of the Dealer Agreement prior to the filing of the lawsuit.

The Court finds that SAM's responses are insufficient. SAM's proffered reasons for not completely responding to the discovery are unavailing. *See* Fed. R. Civ. P. 37(a)(4) (indicating that an incomplete response is equivalent to a party's complete failure to respond).  Here, Toorgeman has admitted that he is storing boxes of SAM's files and SAM's server in his home, but he has not affirmatively searched the boxes or server on his own for responsive information.   Rather, he indicates that his wife and son look through the documents when they can.

If Toorgeman is physically or emotionally unable to search through the documents, then he must hire someone to perform the search on his behalf, as he has an obligation under the Rules to comply with discovery and provide responsive information.  The Court further concludes that the information is relevant in this matter, and SAM's arguments that Canon's employees indicated that SAM did not breach the Dealer Agreement does not preclude Canon from discovering information that SAM may have breached the Dealer Agreement, to support its case defenses.  Therefore, the Court grants Canon's motion to compel as to Requests for Production 4, 5, 7, 8, 9, 10, and 17.  The Court thus orders Toorgeman to search his home for and produce any responsive information to these Requests.

The Court next addresses Canon's request for SAM to hire a forensic computer specialist to

search SAM's server. Here, the evidence suggests that the requested discovery is retained on a server, and therefore accessible because data stored on servers are typically machine-readable and in active format.  *See Zubulake*, 217 F.R.D. at 319-20.  Therefore, because the information is accessible, SAM must bear the costs of searching its server and producing the information to Canon under *Zubulake*.  *Id*.

The Court next concludes that SAM's retention of a forensic specialist is appropriate here. First, it is unclear whether Toorgeman's son has the technological know-how to conduct a comprehensive search on SAM's server.  Furthermore, Toorgeman appears to treat Canon's discovery requests lackadaisically because it is still unclear at this juncture whether he has fully looked through the documents and server stored at his home. In light of these considerations, the Court finds that a technologically qualified third-party forensic analyst would be better suited for searching SAM's hard drive.  Therefore, the Court grants Canon's motion to compel as to Requests for Production 4, 5, 7, 8, 9, 10, and 17, and further grants Canon's request that SAM employ a forensic computer specialist to conduct a search of the hard drive.

### B.    Motion for Sanctions

Canon asserts that SAM has abused the discovery process and refused to provide sufficient responses to Canon's discovery, effectively forcing Canon to seek discovery in a roundabout fashion through multiple subpoenas on third-party entities.  As to the subject motion, Canon indicates that it conferred with SAM in a Rule 37 conference to discuss SAM's discovery responses, but they could not resolve the issue without Court intervention.  Furthermore, Canon notes that SAM confirmed the conference in a letter, where it set forth various issues regarding its discovery.  (R. Doc. 101-2, Ex. A.)

In opposition, SAM contends that sanctions, including attorney's fees and costs, are not warranted here because (1) it did not recall whether the parties engaged in a Rule 37 conference, (2) Canon did not file a motion to compel responses, but instead sought the documents via subpoenas, and (3) Canon now possesses the responsive information.  SAM also maintains that Canon served its subpoenas without generally first consulting SAM or seeking informal discovery through SAM.

The Court finds that the parties sufficiently conferred under the Rules, and therefore examines each of Canon's individual arguments in support of its motion for sanctions below.

1.      **Financial Documents**

Canon first alleges that it never received responsive financial documents to its discovery. In Request for Production 11, Canon sought SAM's financial records, including balance sheets, statements of profits and losses, and general ledgers from the years 2004 to 2006.[2]  (R. Doc. 74-56, Ex. A, p. 12.)  Similarly, in Request for Production 17, Canon requested the financial information described in SAM's initial disclosures.[3]  (R. Doc. 74-6, Ex. A, p. 13.)

In response, SAM indicated that documents responsive to Request for Production 11 were destroyed by Hurricane Katrina and the subsequent building fire, and as to Request for Production 17, that it had produced relevant documents in response to the other discovery inquiries.  (R. Doc. 74-6, Ex. A, pp. 28, 30.)

However, Canon notes that on September 27, 2007, it received an expert report from SAM's accountant, Warren Swenson ("Swenson"), which contained: (1) schedules measuring the financial

---

[2] Canon indicates that it agreed with SAM to limit the applicable years for production from its original request of 1998 to 2006 to 2004 to 2006.  (R. Doc. 74-2, p. 5, n. 1.)

[3] In the initial disclosures, SAM indicated that it had "Financial Records . . . in possession of Warren Swenson and/or Haim Toorgeman supporting" its claims or defenses.  (R. Doc. 74-6, Ex. A, p. 35.)

impact of SAM's losses because of its lack of merchandise and (2) income statements from the years

2003 to 2005.  (R. Doc. 74-7, Ex. B.)  In the report, Swenson indicated that in formulating the loss

sheet, he relied on data from (1) Canon's records and (2) financial statements that Swenson

compiled.  (R. Doc. 74-7, Ex. B, p. 4.)  Thereafter, Canon again reiterated its discovery request for

documents in Swenson's possession.  (R. Doc. 74-8, Ex. C.)  However, SAM's counsel responded

that the requested documents in Swenson's possession "are not under S.A.M.'s control in this

matter.  Accordingly, S.A.M. cannot be compelled to produce them.  I suggest that if you wish to

obtain them, you subpoena them."  (R. Doc. 74-9, Ex. D.)  Canon, thereafter, subpoenaed the

documents on October 11, 2007.  (R. Doc. 74-10, Ex. E.)  Canon also allegedly sought to depose

Swenson, and has yet to hear back from SAM regarding its proposed dates.

    Canon contends that SAM inappropriately asserted that these accounting documents were

not under its control even though Swenson and SAM are in an agency relationship, and therefore,

SAM could have required Swenson to produce the documents to facilitate discovery and provide it

to Canon's counsel.  However, Canon had to seek the information directly from Swenson and

Swenson only provided information after a subpoena process in which SAM instructed Swenson not

to respond as to Toorgeman and S.A.M.T., LLC ("SAMT"), a real estate business related to SAM.

Canon notes that SAM therefore behaved obstructively, especially because Canon allegedly

unearthed documents that SAMT was located at the same physical address as SAM and proceeds

from a sale of products by SAM to Dbuys.com was deposited into a CapitalOne account for SAMT.

(R. Doc. 96-7, Ex. C.)  Canon maintains that only after it wrote another letter to Swenson informing

him of his obligation to respond, did he respond with the relevant documents.

    In opposition, SAM counterargues that it could have not provided hard copies of SAM's

11

documents in Swenson's office because the documents in Swenson's possession had become waterlogged and "stuck together" from the flooding of Hurricane Katrina or from water used to fight the fire at SAM's store.  SAM maintains that such documents were too fragile to be separated and copied, and therefore, SAM invited Canon's counsel to personally inspect the records in December of 2007, to ascertain the contents and condition of the documents.  However, SAM contends that Canon never inspected the documents.  SAM further contends that Swenson provided the remaining data to Canon on disc form.  As to the scheduling of depositions, SAM contends that he said that he was unavailable on the two proposed dates and Canon never made other efforts to reschedule.

After examining the efforts of counsel, the Court concludes that SAM should have obtained its accounting information from Swenson and produced it in response to Canon's discovery requests. SAM's suggestion that Canon seek the requested information directly from Swenson was inappropriate because SAM effectively had control over its own accounting documents.

Nevertheless, the Court also notes that Swenson ultimately provided Canon with the requested electronic documents in disk form, and permitted Canon to inspect the physical documents.  Furthermore, the pleadings and the assertions at the hearing on the motion reveal that Canon did not inspect the water damaged documents, although Swenson made them available for inspection.  Therefore, Canon received or had the opportunity to review all of its requested discovery.

Based on the above information, the Court finds that even though Canon was ultimately provided access to the requested documents, SAM's behavior was less than candid.  In response to Canon's discovery requests, SAM should have requested Swenson to produce its accounting documents to SAM because it had control over its own accounting records, even though it did not

12

physically possess its documents.  *See Socas v. Northwestern Mut. Life Ins. Co.*, Civ. A. 07-20336, 2008 WL 619322, at *3 (S.D. Fla. Mar. 4, 2008) (mandating a party to provide proof that she produced and demanded all responsive documents in her possession or control, even if such responsive information was in the possession of third parties).  The Court concludes that the requested accounting information is critical to the case; Canon incurred unnecessary costs and therefore, prejudice, in subpoenaing Swenson to obtain answers it should have received from SAM; and SAM did not provide a valid explanation for its failure to sufficiently respond.  *Texas A&M Research Foundation*, 338 F.3d at 402.  In light of SAM's discovery response, the Court concludes that sanctions are warranted here, and awards Canon its attorney's fees and costs incurred in issuing the third-party subpoena to Swenson.

### 2.        Invoices to Other Dealers / Other SAM Entities

During the discovery process, Canon also issued *subpoenas duces tecum* to GT Photo, LLC ("GT Photo") and Electric S.A.M., LLC on January 7, 2008, seeking (1) correspondence to other business entities related to SAM[4], (2) invoices, (3) shipment documents, and (4) payment records for Canon products. (R. Doc. 74-14, Ex. I.)  Canon's counsel responded to the subpoenas and provided various invoices reflecting the sale of Canon products in 2006 from SAM to Dbuys.com and Camera Center, and deposit slips from Hibernia National Bank.  (R. Doc. 74-15, Ex. J.)  Canon contends that it sought such information directly from SAM in its written discovery, but the documents were *only* produced upon its subpoenas to the third-party entities. At the hearing, Canon indicated that the documents illustrated that SAMT deposited monies received for Canon products into its account.  It notes that SAM contends that it produced the information, but Canon vehemently

---

[4] Such entities include Videotech, LLC; SAM; S.A.M., LLC; S.A.M. Electronics; S.A.M. Electronics, LLC; Electric S.A.M., LLC; www.electricsam.com; and S.A.M.T., LLC.

disagrees.  In opposition, SAM contends that it has already provided every document to SAM prior to Canon subpoenas to the other entities.

Based on the parties' conflicting representations, it is unclear whether SAM produced the information, or whether Canon had to request the information via subpoena on a third party because SAM did not produce it.  Nevertheless, the Court notes that Canon did not indicate the specific discovery inquiries where it sought such information regarding Canon products and the other, interrelated SAM entities.  Furthermore, Canon did not bring a motion to compel SAM's responses as to those unreferenced discovery inquiries.  At a minimum, Canon should have provided the Court with these discovery inquiries. Canon's failure to provide the discovery requests precludes the Court from rendering a fully informed decision with regards to this issue.  Therefore, the Court denies Canon's motion for sanctions as to these documents.

### 3.      Tax Returns

In Request for Production 12, Canon seeks SAM's federal and state tax returns from 1998 to 2006.  (R. Doc. 74-6, Ex. A, p. 13.)  SAM replied that its tax information is confidential, privileged, and irrelevant, however, it would provide responsive information subject to a confidentiality order.  (R. Doc. 74-6, Ex. A, p. 28.)  Canon contends that it therefore expended costs in entering into a protective order at SAM's request, so that it could obtain SAM's tax returns.

After the parties spent time in making the order and went through the process of securing Court approval of the order, SAM alleged that they did not file any tax returns for the years 2004, 2005, and 2006.  Furthermore, Canon was only provided with one unsigned tax return for the year of 2004, and it only obtained the return upon subpoenaing Swenson.  Therefore, Canon requests the Court to sanction SAM and require it to pay for the attorney's fees and costs expended in entering

into an unnecessary confidentiality agreement.  Canon further notes that despite SAM's insistence

upon a confidentiality order, SAM did not file any confidential documents.

In opposition, SAM maintains that the confidentiality agreement remains appropriate to

safeguard the disclosure of proprietary or confidential information, and the agreement was based

prior language drafted by Canon itself, therefore, any time expended by Canon to review the

document was *de minimus*, as it was their own document.  Furthermore, at the time of the discovery

request, SAM was unclear whether such tax returns were filed.

After reviewing the parties' arguments, the Court denies Canon's request to sanction SAM

for the time Canon's counsel expended in reviewing and editing the confidentiality order.  After

reviewing the parties' confidentiality order, the Court notes that its applicability is not limited to

SAM's tax returns, but the order also encompasses trade secrets and other proprietary information.

(R. Doc. 33.)  Furthermore, the confidentiality protections in the order inure to both SAM and

Canon.  Therefore, the confidentiality order itself is evidence that the parties intended for other

documents to be protected, beyond SAM's tax returns.  While SAM may not have filed any

documents as "confidential" under the terms of the agreed-upon confidentiality order, Canon

ultimately agreed to submit to such an order volitionally and on its own accord for the protection

of trade secrets and proprietary information for both parties.  Accordingly, the Court denies Canon's

motion for sanctions for it costs arising out of drafting and finalizing the protective order and

seeking SAM's tax returns.

### 4.    Insurance Files

In Canon's Interrogatory 1 and Request for Production 6, Canon sought information on the

insurance policies that SAM secured on Canon products from 1998 to 2006[5]. (R. Doc. 74-6, Ex A, pp. 4, 12.) In response, SAM directed Canon to its policy with Fidelity National Insurance Co. ("Fidelity") and two (2) commercial general liability policies that the Phillip and Dorothy Waxman Trust purchased with American Empire Surplus Lines Insurance Co. and Scottsdale Insurance Co. (R. Doc. 74-6, Ex. A, p. 16.) However, SAM purportedly did not directly produce any documents to Canon.

Thereafter, Canon subpoenaed Fidelity, seeking all insurance policies and claims involving SAM, SAM Electronics, Inc., and S.A.M. T., from 1998 to 2006. (R. Doc. 74-17, Ex. L.) Fidelity produced documents, including original invoices and letters from SAM's counsel regarding a $190,000.00 loss of contents from flood and $900,000.00 loss of merchandise from flood. (R. Doc. 74-18, Ex. M.) Also included in Fidelity's materials was a spreadsheet which listed of the models, quantities, and unit prices of various cameras that were alleged to have been damaged. (R. Doc. 74-17, Ex. L.) The letters were addressed to or referred to Denny Dinnat of Fountain Group, LLC ("Fountain Group"), who adjusted the claim for Fidelity. (R. Doc. 74-17, Ex. L.)

Canon then issued a subpoena to SAM's counsel on November 1, 2007, seeking documents from SAM, S.A.M. Electronics, Inc., S.A.M.T., or for the property at 625 Canal Street, New Orleans, Louisiana for insurance claims. (R. Doc. 74-19, Ex. N.) Canon contends that it learned from the documents that SAM's counsel produced that SAM had also procured flood insurance from an agent, Aparicio Walker & Seeling, Inc. ("Aparicio"), and therefore, Canon subpoenaed Aparicio. (R. Doc. 74-22, Ex. P.) Thereafter, it contends that it learned that SAM had obtained an insurance policy from Lafayette Insurance Co. ("Lafayette"), which Canon thereafter subpoenaed as well.

---

[5] SAM indicates that the parties orally agreed to limit the responses to documents from 2004 to 2006. (R. Doc. 89, p. 13, n. 4.)

(R. Doc. 74-23, Ex. Q.)  Canon alleges that SAM did not provide it with any inventory or insurance claim documents from SAM and SAM did not produce any additional insurance documents after being informed of Canon's "discovery," until a month and a half later.  Therefore, Canon seeks the Court to sanction SAM, mandating that it pay the significant costs and fees incurred to acquire documents that SAM and Toorgeman alleged did not exist.

SAM contends that it inadvertently did not produce the additional insurance information because its counsel had filed the insurance documents, not under "Fidelity," but under a file mislabeled as "Fountain Group."  SAM emphasizes that upon discovering its "honest mistake" through Canon, it immediately called and apologized, and eventually sent the insurance documents, rectifying the situation.  It contends that it had no motive to conceal any information because he identified Fidelity, the insurer that paid the adjuster.  Furthermore, SAM maintains that its flood insurance information is irrelevant because there is no such provision in its agreements with Canon to obtain flood insurance.  Furthermore, SAM asserts that it never made any claims under the Lafayette policy, and therefore, the Lafayette policy is irrelevant.

In assessing whether to award sanctions, the Court looks to the four elements which speak to whether SAM's failure to originally provide the insurance information is harmless or substantially justified.  *Texas A&M Research Foundation*, 338 F.3d at 402.  The Court first notes that the insurance evidence is important because it reveals, among other things, the scope of insurance SAM secured on Canon products, the claims SAM made for the products, the extent of damage, and the ultimate insurance proceeds that SAM received for the products.  Next, the Court notes however, that Canon did not suffer significant prejudice regarding this issue because it ultimately received responsive documents from SAM and its insurance carriers.  Nevertheless, Canon did suffer

17

prejudice and unnecessary expense to the extent that it had to issue multiple subpoenas to obtain information which should have been provided in SAM's responses to Canon's written discovery. Finally, the Court finds SAM's explanation of its "honest mistake" for the its failure to disclose the information to be weak, but genuine.  Despite its mistake, Canon noted that SAM did not produce relevant insurance information until a month and a half after its "apology."

In cumulatively evaluating the elements of whether to award sanctions, the Court finds that Canon only received the responsive documents after issuing multiple subpoenas, including one to SAM's counsel.  Furthermore, Canon had already requested the information in written discovery. Therefore, on balance, the factors weigh in favor of the award of sanctions.  SAM's behavior with regards to the insurance information has not been free of question, and therefore, limited sanctions are appropriate here.  The Court therefore awards Canon its attorney's fees and costs incurred in seeking responsive insurance documents.

In conclusion, after considering SAM's collective actions as summarized by the subject pleadings, the Court awards Canon sanctions only as to the work that it expended in issuing the subpoena to Swenson and in seeking insurance information.  Nevertheless, the Court in no way condones SAM's behavior in this action.

IV.     __Conclusion__

Accordingly,

**IT IS ORDERED** that **Canon U.S.A. Inc.'s Motion to Compel Production of Documents and for Sanctions (R. Doc. 74)** is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS GRANTED** as to Canon's motion to compel supplemental responses to **Requests for Production 4, 5, 7, 8, 9, 10, and 17**, based on the documentary information stored in (1) boxes or

18

(2) SAM's server, both at Toorgeman's home.  SAM must provide the supplemental responses no later than fifteen (15) days from the date of this Order.

**IT IS FURTHER GRANTED** in that SAM must hire a forensic computer specialist to search the contents of SAM's server, as located at Toorgeman's home.  SAM must retain the specialist no later than **fifteen (15) days** from the date of this Order.

**IT IS FURTHER GRANTED** as to Canon's request for sanctions for costs incurred in (1) issuing its third-party subpoena to Swenson and obtaining responsive documents to **Requests for Production 11 and 17** and (2) seeking insurance information as to **Interrogatory 1 and Request for Production 6**.  To that end, Canon shall file a motion to fix attorney's fees into the record by **Thursday, June 26, 2008** along with: (1) an affidavit attesting to its attorney's education, background, skills and experience; (2) sufficient evidence of rates charged in similar cases by other local attorneys with similar experience, skill and reputation and; (3) the documentation required by Local Rule 54.2.  Any opposition to the fee application shall be filed no later than **Thursday, July 3, 2008**.  Canon shall notice the motion to fix attorney's fees on **Wednesday, July 9, 2008**, and the motion shall be heard on that date **without oral argument**.

**IT IS DENIED** as to the remainder of Canon's motion for sanctions against SAM.

New Orleans, Louisiana, this <u>20th</u> day of June 2008

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**